UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Laketa Foy, *Plaintiff*, – against – The City of New York, *et al.*, *Defendants.* | **1:17-CV-0406** **Not for Publication** **Opinion & Order** |

ROSS, United States District Judge:

The plaintiff in this case was arrested and prosecuted for allegedly blocking traffic on a side street in Queens, New York. Specifically, the plaintiff, a pedestrian, stopped to give directions to a motorist, whose stationary vehicle may have then temporarily impeded the progress of a police car. This unremarkable scenario soon escalated into a custodial arrest, the claimed use of excessive force, an assertedly humiliating search of the plaintiff's person, and a two-year prosecution, which was eventually dropped.

After the dismissal of her criminal case, the plaintiff filed suit against the two police officers who arrested her and the City of New York, alleging false imprisonment, use of excessive force, and unreasonable search under federal law and malicious prosecution under both federal and state law. The defendants now move for summary judgment on every claim except the use of excessive force. The dubious wisdom of the defendants' conduct notwithstanding, I find that the law entitles them to summary judgment on the plaintiff's federal claims (other than the use of excessive force) but not on the plaintiff's state-law malicious-prosecution claim.

## BACKGROUND

*The Initial Encounter*

In the late morning of June 28, 2014, defendant Officers Lenna Milligan and Michael Faria of the New York City Police Department were in a patrol car driving westbound on Pershing Crescent, in Queens, in response to a request for police assistance. *See* Defs.' 56.1 Statement ¶¶ 1, 3–4, ECF No. 50; Pl.'s 56.1 Resp. ¶¶ 1, 3–4, ECF No. 53. Halfway along Pershing Crescent, which is arc-shaped but runs roughly east–west, lies a T-intersection with Lander Street, which runs one-way northbound from Pershing Crescent. *See* Bellin Decl. Ex. 2, ECF No. 54. Traffic on Pershing Crescent travels in both directions east of the Lander Street intersection but runs one-way eastbound west of Lander Street. *See id.* As the officers drove west along Pershing Crescent, before reaching the intersection with Lander Street, the officers encountered plaintiff Laketa Foy, who was on foot and speaking to a motorist in a stopped, westbound vehicle. *See* Defs.' 56.1 Statement ¶¶ 5–6; Pl.'s 56.1 Resp. ¶¶ 5–6.

According to Milligan, Foy was standing in the street, and the motorist to whom she was speaking was blocking another vehicle, prompting the driver of the second vehicle, which was in front of the police car, to blow the vehicle's horn. Weiner Decl. Ex. C, at 53:9–54:25, 56:7–57:6, ECF No. 51. After the horn sounded, Milligan testified, the motorist moved her vehicle out of the way, the second vehicle drove off, and the police continued westward on Pershing Crescent, past the intersection with Lander Street. *Id.* at 67:24–68:11, 73:19–74:7; Bellin Decl. Ex. 3, at 71:24–72:11. Milligan testified that she did not say anything to Foy at this time. Weiner Decl. Ex. C, at 76:3–13.

Foy remembers the event differently. According to Foy, she was standing on the sidewalk on the southern side of Pershing Crescent while she was talking to the motorist, and there were no other vehicles driving in the street aside from those of the motorist and the

police. *See id.* Ex. B, at 86:24–87:16, 88:25–89:12, 90:21–92:4; Bellin Decl. Ex. 1, at 100:14–20. Foy testified that there was enough room for other cars to pass the motorist's stopped vehicle in any event. Weiner Decl. Ex. B, at 86:24–87:5. Foy testified that the police drove up, said, "Don't block the street," and then drove past the motorist. *Id.* at 88:3–9, 92:10–93:2. According to Foy, the motorist drove away only after the police car had passed by. *Id.* at 88:3–14, 92:25–93:11.

Faria, for his part, does not remember this encounter at all. *See* Bellin Decl. Ex. 9, at 82:22–83:11. He testified that he first saw Foy only after the officers had arrived at their destination and exited the patrol car. *See id.* at 38:2–39:11; Weiner Decl. Ex. A, at 31:21–25.

*The Arrest*

After this first encounter with the police, Foy walked to and entered the intersection of Pershing Crescent and Lander Street. *See* Defs.' 56.1 Statement ¶ 11; Pl.'s 56.1 Resp. ¶ 11. The officers observed her in the street and placed her under arrest. Defs.' 56.1 Statement ¶¶ 11, 14; Pl.'s 56.1 Resp. ¶¶ 11, 14. Although Foy claims that she was simply crossing the street, there is no marked crosswalk across Pershing Crescent at that intersection. *See* Defs.' 56.1 Statement ¶¶ 12–13; Pl.'s 56.1 Resp. ¶¶ 12–13; Weiner Decl. Ex. J. As with the previous encounter, the parties' recollections of the details of this event differ.

Foy testified that because it appeared that the motorist would enter the one-way portion of Pershing Crescent driving the wrong direction, Foy gestured to the motorist from the curb not to go that way. Weiner Decl. Ex. B, at 88:3–18, 93:6–94:21. According to Foy, the motorist then executed a U-turn and drove off, at which time Foy began crossing Pershing Crescent at the Lander Street intersection. *Id.* at 88:3–23, 93:6–94:11. Foy testified that the police saw her in the street and that Milligan commanded her to stop and asked, "Didn't I tell you not to block the street?" *Id.* at 94:6–97:13; Bellin Decl. Ex. 1, at 98:8–14.

Milligan and Faria, by contrast, testified that they saw Foy standing in the street and talking to the motorist, who was then facing eastbound. *See* Weiner Decl. Ex. A, at 36:18–37:25; *id.* Ex. C, at 82:3–25; Bellin Decl. Ex. 3, at 71:24–72:5; *id.* Ex. 9, at 39:12–20. According to her testimony, Milligan said, "Move over, come out the street," to which Foy responded by yelling obscenities and saying that she was giving the motorist directions. Weiner Decl. Ex. C, at 87:2–24; Bellin Decl. Ex. 3, at 89:14–19. Milligan testified that Foy refused to get out of the street. Bellin Decl. Ex. 3, at 90:14–25.

*After the Arrest*

The police did not search Foy at the scene of the arrest but took her to the 107th precinct for processing. Defs.' 56.1 Statement ¶¶ 16–17; Pl.'s 56.1 Resp. ¶¶ 16–17. At the precinct, Milligan asked Foy whether she had any items on her person. *See* Defs.' 56.1 Statement ¶ 18; Pl.'s 56.1 Resp. ¶ 18. According to her testimony, Foy responded that she did, in her bra. Bellin Decl. Ex. 1, at 140:1–3. Milligan removed a credit card and cash from Foy's bra, without exposing Foy's breasts. Defs.' 56.1 Statement ¶¶ 20–21; Pl.'s 56.1 Resp. ¶¶ 20–21. Milligan then patted down Foy's bra area through her T-shirt. *See* Defs.' 56.1 Statement ¶ 22; Pl.'s 56.1 Resp. ¶ 22.

Later that day, Foy was transported to Queens Central Booking and was arraigned on charges of disorderly conduct and resisting arrest. *See* Defs.' 56.1 Statement ¶¶ 23–24; Pl.'s 56.1 Resp. ¶¶ 23–24. Foy was released on her own recognizance. Defs.' 56.1 Statement ¶ 25; Pl.'s 56.1 Resp. ¶ 25. The criminal charges against Foy were ultimately dismissed on motion of the district attorney on September 13, 2016, more than two years after her arrest. *See* Defs.' 56.1 Statement ¶ 26; Pl.'s 56.1 Resp. ¶ 26.

Foy's counsel served a notice of claim on the city alleging malicious prosecution. Defs.' 56.1 Statement ¶ 28; Pl.'s 56.1 Statement ¶ 28. The notice, dated November 4, 2016, was

received by the city on or before November 10, 2016. *See* Bellin Decl. Ex. 7. Foy's counsel subsequently received from the city a demand that Foy submit to an examination pursuant to section 50-h of the New York General Municipal Law. Weiner Decl. Ex. I. Although the demand was dated December 15, 2016, the office manager for Foy's counsel represents that they did not receive it until "a few days before" the January 30, 2017 hearing date. Bellin Decl. Ex. 8, at 1–2. In the meantime, on January 25, 2017, Foy's counsel filed this lawsuit. Bellin Decl. ¶ 13. In an affidavit, the office manager swears that on January 27, 2017, she contacted the law firm at which the 50-h hearing was scheduled to be held and requested an adjournment. *Id.* Ex. 8, at 2. Foy did not attend the January 30 hearing, and the office manager states that the law firm never received a notice rescheduling the hearing. *See id.*; Defs.' 56.1 Statement ¶ 30; Pl.'s 56.1 Resp. ¶ 30.

*The Instant Motion*

Plaintiff's amended complaint alleges several federal constitutional violations: false imprisonment and use of excessive force by both Milligan and Faria and unreasonable search and malicious prosecution by Milligan only. Am. Compl. ¶¶ 35–77, ECF No. 15. The complaint also alleges that Milligan and the city are liable for malicious prosecution under New York law. *Id.* ¶¶ 96–98.[1] Defendants have moved for summary judgment on all claims except the use of excessive force. *See* Defs.' Br. 1, ECF No. 52. For the reasons set forth below, I grant summary judgment to defendants on the false-imprisonment, unreasonable-search, and federal malicious-prosecution claims but deny summary judgment on the state malicious-prosecution claim.

---

[1] Although the complaint seeks to hold the city liable for the federal constitutional violations, plaintiff has abandoned these claims. *See* Am. Compl. ¶¶ 78–95; Pl.'s Opp'n 1, ECF No. 55.

5

**DISCUSSION**

"Summary judgment is appropriate only where the record shows 'that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 80 (2d Cir. 2014). In resolving the motion, "[t]he court construes all evidence in the light most favorable to the non-moving party, drawing all inferences and resolving all ambiguities in [her] favor." *Amore v. Novarro*, 624 F.3d 522, 529 (2d Cir. 2010). "It is the movant's burden to show that no genuine factual dispute exists" (*Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970))), and "in determining whether the moving party has met this burden . . . , the district court may not rely solely on the statement of undisputed facts" but "must be satisfied that the citation to evidence in the record supports the assertion" (*Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Giannullo*, 322 F.3d at 143 n.5)).

**A.   False Imprisonment**

"Probable cause 'is a complete defense to an action for false [imprisonment]' brought under New York law or [42 U.S.C.] § 1983." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "In deciding whether probable cause existed for an arrest," I must "assess 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.'" *Id.* at 19–20 (quoting *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006)). In this inquiry, the "officer's state of mind is simply 'irrelevant.'" *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). That is, "when reviewing an arrest," I must "ask 'whether the circumstances, viewed objectively, justify [the challenged] action,' and if so, conclude 'that

action was reasonable *whatever* the subjective intent motivating the relevant officials.'" *Id.* (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011)).

Probable cause "arises from the combination of an officer's understanding of the facts and his understanding of the relevant law." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). The "officer's assessment in this regard need not 'be perfect' because 'the Fourth Amendment allows for some mistakes on the part of government officials,' including 'reasonable . . . mistakes of law.'" *United States v. Diaz*, 854 F.3d 197, 203 (2d Cir. 2017) (quoting *Heien*, 135 S. Ct. at 536), *cert. denied*, 138 S. Ct. 981 (2018). But those mistakes "must be *objectively* reasonable." *Heien*, 135 S. Ct. at 539. Courts "do not examine the subjective understanding of the particular officer involved." *Id.*

In New York—provided that probable cause exists—"the police may arrest someone without a warrant for a 'petty offense,'" including "traffic infractions." *United States v. McFadden*, 238 F.3d 198, 201–02 (2d Cir. 2001); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). "[A] violation of any New York City traffic regulation is an arrestable 'traffic infraction' under New York State law." *United States v. Dupree*, No. 16-CR-0084 (ARR), 2016 WL 10703796, at *2 n.1 (E.D.N.Y. Aug. 29, 2016), *aff'd*, 767 F. App'x 181 (2d Cir. 2019), *petition for cert. filed*, No. 19-5343 (U.S. July 23, 2019). New York City regulations provide that "[n]o pedestrian shall cross any roadway at an intersection except within a crosswalk." 34 R.C.N.Y. § 4-04(c)(2).

Defendants argue that they had probable cause to arrest Foy because—even accepting as true her version of the facts—they saw her crossing the intersection not within a crosswalk.

7

Defs.' Br. 5–6. Plaintiff counters that although she was not in a *marked* crosswalk, she was in fact crossing the street in an *unmarked* crosswalk. *See* Pl.'s Opp'n 10–12, ECF No. 55.

New York City regulations define "crosswalk" to include both "marked" and "unmarked" crosswalks. *See* 34 R.C.N.Y. § 4-01(b). As relevant here, "[t]he term 'unmarked crosswalk' means that part of a roadway, other than a marked crosswalk, that is included within the extensions of the sidewalk lines between opposite sides of the roadway at an intersection." *Id.* Plaintiff asserts that this means that "a crosswalk exists between the end of a sidewalk where it meets the roadway and the other side of the street" and thus concludes that "an unmarked crosswalk existed between the end of the sidewalk on Lander Street and the opposite side of Pershing Crescent." Pl.'s Opp'n 12.

The difficulty for plaintiff is that Lander Street and Pershing Crescent meet at a T-intersection and Foy was crossing "from the top of the 'T' to its stem on the opposite side" (*Fan v. Buzzitta*, 344 N.Y.S.2d 788, 789 (App. Div. 1973)). The Appellate Division of the New York Supreme Court, in interpreting a state statute with language very similar to the city regulation,[2] has said that because the statute's language "requires a connection between the lateral lines of the sidewalk on opposite sides of the highway," it "omits the idea of simply prolonging the lines across the intersection whether or not there is a sidewalk running in the same direction on the other side." *Id.* at 790. In other words, the literal language of the law "excludes" a T-intersection. *Id.*

In the context of the state statute, the Appellate Division rejected the literal interpretation, ruling that it would be "absurd" to exclude from the law's coverage "a condition as commonplace as a 'T' intersection, where there is as much need to protect pedestrians as at

---

[2] The statute defines "crosswalk" to include the "part of a roadway at an intersection included within the connections of the lateral lines of the sidewalks on opposite sides of the highway." *Fan*, 344 N.Y.S.2d at 789–90 (quoting N.Y. Veh. & Traf. Law § 110(a)).

8

a cross-intersection," and concluding that the legislature must have "inadvertently overlooked" T-intersections. *Id.*

Here, however, the regulatory history of the city regulation confirms that T-intersections were not overlooked by the regulation's drafters. The New York City Department of Transportation defined "unmarked crosswalks" explicitly to "make[ ] clear that unmarked crosswalks do not exist at two of the three crossings in a 'T'-intersection." 34 R.C.N.Y. § 4-01 (West 2005) (quoting City Record, June 8, 2005); *see also id.* ("[T]he roadway that ends at a 'T'-intersection has no 'opposite side' across the intersection.").[3] In light of this unambiguous regulatory intent, I apply the literal meaning of the city regulation and conclude that there is no unmarked crosswalk at the intersection of Lander Street and Pershing Crescent.[4] Hence the officers had probable cause to arrest Foy for jaywalking in violation of section 4-04(c)(2).

Some New York state courts, citing *Fan*, have ruled that similar T-intersections in New York City could contain unmarked crosswalks within the meaning of the city regulations. *See Bergamo v. Verizon N.Y., Inc.*, 944 N.Y.S.2d 211, 214 (App. Div. 2012); *Alli v. Lucas*, 902 N.Y.S.2d 104, 106 (App. Div. 2010). But I find it impossible to square these decisions—which simply cite *Fan* and do not explain their reasoning—with the text and unambiguous regulatory purpose of section 4-01(b). Moreover, even if these contrary decisions are correct, the foregoing discussion demonstrates that "it was reasonable for [the] officer[s] to suspect that [Foy]'s conduct was illegal" (*Heien*, 135 S. Ct. at 539). Because the officers' belief that Foy was not in an unmarked crosswalk was at the very least "an objectively reasonable . . . interpretation of an ambiguous state law" (*Diaz*, 854 F.3d at 204), they had probable cause to make the arrest.

---

[3] The city's purpose in doing so was evidently to secure additional parking spaces within T-intersections (*see* § 4-01 (West 2005) (quoting City Record, June 8, 2005)), a reasonable desire inside New York City but one that is not likely to be shared by the rest of the state.

[4] There is a *marked* crosswalk at the intersection, but only across Lander Street. *See* Weiner Decl. Ex. J.

None of that, of course, is to suggest that the decision to arrest was a sensible one. *Cf. Roper v. City of New York*, No. 15-CV-8899 (PAE), 2017 WL 2483813, at *4 (S.D.N.Y. June 7, 2017) ("[C]ourts have understandably expressed some skepticism about justifying custodial arrests undertaken for other reasons based on violations of traffic laws that likely are rarely the subject of arrests."); *Gonzalez v. City of New York*, No. 14-CV-7721 (LGS), 2017 WL 149985, at *2 (S.D.N.Y. Jan. 13, 2017) ("The constitutionality of subjecting someone who steps off the sidewalk and walks a few steps in the roadway to a full-blown custodial arrest appears dubious, but binding precedent dictates the outcome in this case."). The Supreme Court, however, has made clear that "gratuitous humiliations imposed by a police officer who was (at best) exercising extremely poor judgment" do not necessarily violate the Constitution. *Atwater*, 532 U.S. at 346–47. Defendants are entitled to summary judgment on plaintiff's false-imprisonment claim.

**B.     Unreasonable Search**

"The prevailing rule under the Fourth Amendment that searches and seizures may not be made without a warrant is subject to various exceptions," including "searches incident to custodial arrests." *United States v. Edwards*, 415 U.S. 800, 802 (1974). "[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *Id.* at 803 n.3 (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)). "[T]he constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence. The fact of a lawful arrest, standing alone, authorizes a search." *Maryland v. King*, 569 U.S. 435, 449 (2013) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979)). Although such a search "could be made on the spot at the time of

10

arrest," it may also "legally be conducted later when the accused arrives at the place of detention." *Edwards*, 415 U.S. at 803.

The extent of a suspicionless search incident to arrest is not without limit, however. "[A] search incident to a lawfully executed arrest may still violate the Fourth Amendment, if conducted in an otherwise unreasonable manner." *Scalpi v. Amorim*, No. 14-CV-2126 (KMK), 2018 WL 1606002, at *18 (S.D.N.Y. Mar. 29, 2018) (citation omitted), *appeal dismissed*, No. 18-1279 (2d Cir. June 12, 2018). For example, the Second Circuit has long held that "[t]he Fourth Amendment requires an individualized 'reasonable suspicion that [a misdemeanor] arrestee is concealing weapons or other contraband . . .' before she may be lawfully subjected to a strip search." *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (second alteration in original) (quoting *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986)); *see also Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 341–42 (2012) (Alito, J., concurring) ("For [persons arrested for minor offenses], admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable, particularly if an alternative procedure is feasible."). And "'unreasonable, non-consensual, inappropriate touching' can constitute 'unreasonable intrusions into a plaintiff's bodily integrity in violation of the Fourth Amendment.'" *Scalpi*, 2018 WL 1606002, at *18 (quoting *Golden v. County of Westchester*, No. 10-CV-8933 (ER), 2012 WL 4327652, at *5 (S.D.N.Y. Sept. 18, 2012)). "Some bodily intrusions may be provably accidental or de minimis and thus constitutionally reasonable," however. *Id.* (quoting *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001)).

Finally, "qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To determine whether the

relevant law was clearly established, [courts] consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014).

Here, plaintiff's principal argument is that the search of her person at the stationhouse was "unreasonable as a matter of law" because "the defendants lacked probable cause to arrest the plaintiff for any offense" in the first place. Pl.'s Opp'n 13–14. As explained above, I find that the officers did have probable cause to arrest Foy (*see supra* Section A), so this argument fails.

Plaintiff also asserts, however, that "the search into Ms. Foy's underwear in an arrest for the minor offense of disorderly conduct . . . was unreasonable," noting that "[t]he defendants do not claim that they had any reason to believe that Ms. Foy was secreting either contraband or a weapon anywhere on her person." Pl.'s Opp'n 13 & n.4.

It is clear that, based on the evidence in the record, subjecting Foy to a strip search would indeed have been unreasonable. *See Hartline*, 546 F.3d at 102. But the search that Foy is complaining of was somewhat less invasive than that—though how much less invasive I cannot say. The parties agree only that Milligan somehow "removed a credit card and money from Plaintiff's bra" and that "Plaintiff's breasts were not exposed" when this happened. Defs.' 56.1 Statement ¶¶ 20–21; *see also* Pl.'s 56.1 Resp. ¶¶ 20–21. Foy's testimony sheds no further light on the search. *See* Weiner Decl. Ex. B, at 140:1–143:5. Nothing in the record discloses whether, for example, the credit card and money were extruding from Foy's bra and thus easily grabbable or Milligan actually touched or manipulated Foy's body. This failure is plaintiff's. *Cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, . . . the nonmoving party [must]

. . . designate 'specific facts showing that there is a genuine issue for trial.'"). Additionally, plaintiff has identified no caselaw—nor have I found any—that speaks to the precise question presented. Without a factual basis to find that any intrusion was more than de minimis, and in the absence of clearly established law on point, I find that Milligan is entitled to qualified immunity on the claim that her removing items from Foy's bra was an unreasonable search.[5]

**C.     Malicious Prosecution Under § 1983**

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of [her] rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted). In New York, those elements are: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* at 161 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)).

State and federal law differ, however, on what it means for the proceedings to terminate in the plaintiff's favor. The New York Court of Appeals has held that, under state law, "any termination of a criminal prosecution, such that the criminal charges may not be brought again, qualifies as a favorable termination, so long as the circumstances surrounding the termination are *not inconsistent with* the innocence of the accused." *Cantalino v. Danner*, 754 N.E.2d 164, 167 (N.Y. 2001) (emphasis added). By contrast, the Second Circuit has recently held that, under federal law, "the underlying criminal proceeding must be terminated 'in a manner that is

---

[5] As for Milligan's pat-down of Foy, that search was not unreasonable. *See, e.g.*, *Scalpi*, 2018 WL 1606002, at *18 ("Courts in the Second Circuit have consistently held that . . . brief contact with an arrestee's breasts or genital area [through their clothes] during a pat-down, without more, is insufficient to violate the Fourth Amendment.").

13

*indicative of* Plaintiff's innocence.'" *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018). Consequently, the Second Circuit has affirmed the dismissal of a federal malicious-prosecution claim where the plaintiff "alleged that the charges against him 'were dismissed' at some point after a jury trial, without specifying how or on what grounds." *Id.* at 28.

Defendants' sole argument for summary judgment on plaintiff's federal malicious-prosecution claim is that "Plaintiff cannot meet her burden to show that her prosecution ended in a manner that affirmatively indicates her innocence." Defs.' Br. 7. Defendants are correct. The evidence in the record is simply that Foy's criminal case was dismissed on motion of the district attorney. *See* Weiner Decl. Ex. G. It is undisputed that "Plaintiff does not know why her criminal charges were dismissed." Defs.' 56.1 Statement ¶ 27; *see also* Pl.'s 56.1 Resp. ¶ 27. Plaintiff argues that because "there was no motion pending to dismiss for lack of a speedy trial or to dismiss in the interests of justice[,] [i]t is fair to conclude . . . that the District Attorney's motion to dismiss was based on an inability to prove guilt beyond a reasonable doubt." Pl.'s Opp'n 16. That speculation is insufficient to meet the standard set out in *Lanning*. *See, e.g.*, *Stora v. City of New York*, No. 16-CV-4541 (ERK), 2019 WL 1746955, at *6 (E.D.N.Y. Apr. 18, 2019) (dismissing federal malicious-prosecution claim where plaintiff could "only state that '[i]t was the Office of the District Attorney that moved to have the case dismissed and sealed'" and it was "undisputed that the criminal prosecution . . . was 'not dismissed on a speedy trial violation . . . or a result of the plaintiff's *Clayton* motion [to dismiss in the interests of justice]'" (alterations in original)).

The cases that plaintiff cites for the proposition that "[a] dismissal on motion of the prosecutor compels an inference of lack of reasonable grounds for the prosecution" (Pl.'s Opp'n 16) predate—and are inconsistent with—*Lanning*. In *Clark v. City of New York*, No. 09-CV-2533 (PKC), 2015 WL 5719612 (E.D.N.Y. Sept. 29, 2015), the court was proceeding

under the mistaken understanding that "the plaintiff's burden is to demonstrate a final termination that is not inconsistent with innocence." *Id.* at *9 (quoting *Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 229 (E.D.N.Y. 2010)). The same is true of *Naim v. City of New York*, No. 10-CV-0912 (FB), 2012 WL 2923308 (E.D.N.Y. July 18, 2012). *See id.* at *3 ("'[A] dismissal without prejudice qualifies as a final, favorable termination if' . . . 'the circumstances surrounding the termination are not inconsistent with the innocence of the accused.'" (citation omitted) (first quoting *Smith-Hunter v. Harvey*, 734 N.E.2d 750, 754 (N.Y. 2000); then quoting *Cantalino*, 754 N.E.2d at 167)). In *Lanning*, the Second Circuit explicitly rejected this standard. *See* 908 F.3d at 24–25.

The point is finely demonstrated by *McKenzie v. City of New York*, No. 17-CV-4899 (PAE), 2019 WL 3288267 (S.D.N.Y. July 22, 2019). In that case, the plaintiff was claiming malicious prosecution under both New York and federal law with respect to two different criminal charges. *See id.* at *14–15. The first charge had been dismissed before trial on an "unexplained [motion] by the Bronx District Attorney's Office." *Id.* at *15. By contrast, the district attorney dropped the second charge at trial "on the ground that the evidence of . . . guilt was insufficient." *Id.* at *14. The district court ruled that the plaintiff could go forward with both state and federal malicious-prosecution claims with respect to the second charge but rejected the plaintiff's *federal* claim as to the first charge, because the plaintiff had not "adduced any basis on which to argue that that decision '. . . affirmatively indicated his innocence.'" *Id.* at *15 (quoting *Lanning*, 908 F.3d at 28).

Here, plaintiff is suing over a similarly unexplained pretrial motion to dismiss by the prosecutor. And just as in *McKenzie*, although plaintiff may have a successful malicious-prosecution claim under state law, she has not presented sufficient evidence to prevail under

15

federal law. Milligan is entitled to summary judgment on the federal malicious-prosecution claim.

## D. Malicious Prosecution Under New York Law

As noted in the previous section, a claim for malicious prosecution is somewhat easier to make out under New York law than under § 1983. But there are additional hurdles that a plaintiff must overcome in order to bring such a claim against a municipality. Broadly speaking, a plaintiff seeking to sue a municipality is required to serve a notice of claim against the municipality (*see generally* N.Y. Gen. Mun. Law § 50-e) and, upon the municipality's demand, to sit for an examination before she may file suit (*see generally* § 50-h). "[A] claimant may not, under any circumstances, commence a suit against the City within 30 days after the filing of a notice of claim, but can do so thereafter provided that no demand for an examination has yet been served by the City." *Alouette Fashions, Inc. v. Consolidated Edison Co. of N.Y., Inc.*, 501 N.Y.S.2d 23, 26–27 (App. Div. 1986). If "the [municipality's] demand has been served . . . at a time when no action has yet been instituted, the claimant may not thereafter commence an action until the demand has been complied with." *Id.* at 27. Defendants argue that they are entitled to summary judgment on plaintiff's state-law claim because plaintiff failed to comply with this statutory scheme. *See* Defs.' Br. 13.

In this case, the record reveals that plaintiff served a notice of claim on the city in early November 2016 (*see* Bellin Decl. Ex. 7) and filed this lawsuit on January 25, 2017 (*see* Compl., ECF No. 1). Additionally, the city served a demand for examination on plaintiff's counsel (Weiner Decl. Ex. I), and Foy failed to attend that examination, which was scheduled for January 30, 2017 (*see* Defs.' 56.1 Statement ¶ 30; Pl.'s 56.1 Resp. ¶ 30). Absent from the record, however, is a critical piece of information: the date on which the city served the demand on plaintiff's counsel. If the demand was served before plaintiff filed her complaint, the claim

16

must be dismissed for failure to comply with section 50-h. *See Brian VV v. Chenango Forks Cent. Sch. Dist.*, 751 N.Y.S.2d 59, 60 (App. Div. 2002). But if the complaint was filed before the demand was served, the claim survives—though plaintiff may still be required to sit for the examination. *See Alouette Fashions*, 501 N.Y.S.2d at 27.

For her part, plaintiff offers the declaration of her attorney, who swears that they had not yet received the demand when the complaint was filed (*see* Bellin Decl. ¶ 13), and the declaration of the attorney's office manager, who swears that the demand was not received "until a few days before the January 30 hearing date" (*id.* Ex. 8, at 1–2). Defendants argue that I should disregard the office manager's declaration[6] and also object that "Plaintiff has not produced documentary evidence, such as a postmarked envelop[e], indicating that she received notice of the § 50-h hearing on January 26, 2017." Defs.' Reply 4–5 & n.2, ECF No. 57. But defendants put in no countervailing evidence of their own regarding when the demand was served. Instead, they rely simply on the demand itself, which is dated December 15, 2016. *See* Weiner Decl. Ex. I. The actual date of service is thus a disputed issue of fact. *Cf. Stewart v. N.Y.C. Transit Auth.*, 856 N.Y.S.2d 638, 639 (App. Div. 2008) (ruling that hearing was required to resolve "question of fact regarding when [a] notice of claim was served" where defendant "submitted . . . a copy of the notice of claim with a 'date received' stamp of October 18, 2004," and plaintiff "submitted an affidavit from a paralegal who averred that she personally mailed the notice of claim on July 21, 2004").

---

[6] Defendants argue that the office manager's declaration is improper because the officer manager was not disclosed to defendants as a witness. *See* Defs.' Reply 4, ECF No. 57. Putting to one side the lack of evidence in the record for this assertion, I need not decide this question because my analysis would remain the same whether or not I considered the office manager's declaration. The critical issue—the timing of the service of the demand vis-à-vis the filing of the complaint—is adequately addressed in plaintiff's counsel's declaration (*see* Bellin Decl. ¶ 13), to which defendants have not objected.

17

Defendants point to caselaw suggesting that "'a 'plaintiff's failure to attend a 50-h Hearing—*no matter the reason*—is a complete bar to his state law claims against the City'" (*Duncan v. City of New York*, No. 11-CV-3901 (ENV) (JO), 2018 WL 3421312, at *3 (E.D.N.Y. July 13, 2018) (quoting *Kennedy v. Arias*, No. 12-CV-4166 (KPF), 2017 WL 2895901, at *13 (S.D.N.Y. July 5, 2017))). *See* Defs.' Reply 3–4. *But see Johnson v. City of New York*, No. 15-CV-6915 (ER), 2019 WL 294796, at *15 n.11 (S.D.N.Y. Jan. 23, 2019) ("The Court notes that neither federal nor New York state courts . . . are consistent on this point."). This statement sweeps broadly, but it appears in cases in which there is no dispute that the demand for examination was properly served in the first place. *See, e.g.*, *Duncan*, 2018 WL 3421312, at *3 ("[T]he City indisputably sent the § 50-h notices to the correctly listed address on the notice of claim filed by an attorney holding himself out as one of plaintiff's attorneys . . . ."); *Kennedy*, 2017 WL 2895901, at *3 ("Notice of a hearing under New York General Municipal Law § 50-h . . . was mailed to [Plaintiff's attorney] on June 20, 2011."). Where the demand for examination is not served until after the complaint is filed, it is clear that a plaintiff need not have attended a hearing that she could not have known about. *See Alouette Fashions*, 501 N.Y.S.2d at 27. Viewing the disputed facts in the light most favorable to plaintiff, I deny this branch of defendants' motion.[7]

**CONCLUSION**

For the foregoing reasons, defendants' motion for partial summary judgment is granted in part and denied in part. Specifically, summary judgment is granted to defendants on plaintiff's federal claims of false imprisonment, unreasonable search, and malicious

---

[7] I also note that, were I to find that the demand for examination had been served timely, this would result in a dismissal of plaintiff's claim against New York City only. *See Gilliard v. City of New York*, No. 10-CV-5187 (NGG), 2013 WL 521529, at *15 n.19 (E.D.N.Y. Feb. 11, 2013) ("[F]ailure to comply with section 50-h precludes only claims against the City, not employees who are sued in their individual capacities alongside the City."); *accord Morales v. Irizarry*, 976 F. Supp. 256, 258 (S.D.N.Y. 1997).

18

prosecution, and plaintiff's abandoned claims for municipal liability under federal law are dismissed. Summary judgment is denied, however, on plaintiff's claim of malicious prosecution under state law. Thus, only the state-law claim and plaintiff's federal claim of excessive force remain in the proceeding.

    So ordered.

                                             ____/s/_____
                                             Allyne R. Ross
                                             United States District Judge

Dated:       August 7, 2019
               Brooklyn, New York